20 CV 2331

JUDGE HALPERN

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE<br>c/o The Law Office of Thuy Q. Pham<br>225 West 23rd Street, #6G<br>New York, NY 10011<br>　　　　　　　　　Plaintiff,<br><br>HELEN HAYES HOSPITAL, THE<br>Route 9W<br>West Haverstraw, NY 10993<br>and<br>GLENN M. SELIGER<br>38 Cragmere Oval<br>New City, NY 10956<br>and<br>1-100 JOHN ROES,<br>　　　　　　　　　Defendants. | Civil Action No.<br>Judge<br><br><br><br><br>**VERIFIED COMPLAINT FOR<br>VIOLATION OF CIVIL RIGHTS<br>AND JURY DEMAND**<br><br>Date received: 3/16/2020<br><br><br>UNITED STATES DISTRICT COURT |

Plaintiff Jane Doe ("Plaintiff"), through her attorney, for her Complaint against The Helen Hayes Hospital ("HHH"), Dr. Glenn M. Seliger ("Dr. Seliger") in his official and individual capacities, and other unknown individuals (collectively, "Defendants"), alleges, based upon personal knowledge, relevant documents, and information and belief as follows:

## INTRODUCTION

1.　This is a civil action for deprivation of rights caused by Defendants, injunctive relief, and for compensatory and punitive damages.

2.　Defendants violated and continue to violate Plaintiff's Fourteenth Amendment protection from arbitrary and unconscionable actions by a state government, by withholding medically necessary rehabilitative therapies from Plaintiff for the unconscionable purpose of interfering with or obstructing Plaintiff's right to have sixty (60) days to prepare a request for a Medicare hearing before an administrative law judge, pursuant to 42 CFR § 405.1014(c)(1).

1

3. Defendants violated and continue to violate Plaintiff's Fourteenth Amendment protection from arbitrary and unconscionable actions by a state government, by engaging in the discharge process with flagrant disregard of Medicare notification requirements, professional code of conduct requirements for accuracy in medical records, and professional code of conduct requirements prohibiting the subordination of a patient's medical interest in favor of an illegitimate financial interest of a health care institution.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter, pursuant to 28 U.S.C. § 1331 based on 42 U.S.C. § 1983 and questions of federal law. HHH is continued under the authority of the New York State Commissioner of Health, pursuant to the New York Consolidated Laws, Public Health Law PBH §§ 403(1)(a) and 2600(1). Dr. Seliger is employed by New York State as an employee of HHH.

5. This Court has personal jurisdiction over the Defendants, because the Defendants do business, reside in, or work in the State of New York.

6. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b)(2) and 1395(a), because HHH is principally located in this district, and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

7. Plaintiff is 78 years old, and normally resides in Queens County, New York. Since December 6, 2019, the Plaintiff has been an inpatient at HHH in West Haverstraw, New York, which is 50 miles from Plaintiff's home. Plaintiff is a Medicare beneficiary. Plaintiff is currently bedridden, and must be in the care of a medical institution. Plaintiff's son and sister

have separate authority to act as Plaintiff's legal health care proxy, and both have power of attorney over Plaintiff.

8. HHH is an inpatient rehabilitation facility located in West Haverstraw, New York. HHH is owned and operated by the New York State Department of Health. HHH is an affiliate of the NewYork-Presbyterian health care network ("NYP Network"), which is a private network.

9. Dr. Glenn M. Seliger ("Dr. Seliger") is the Director of Traumatic Brain Injury Rehabilitation Service at HHH. Dr. Seliger is Board Certified in Neurology.

10. For purposes in this complaint, Dr. Seliger acted in his official capacity as a New York State employee, employed by HHH, and in his individual capacity as an employee in the NYP Network.

11. The true names and capacities of the defendants named above as ROES 1 through 100, inclusive, are unknown to Plaintiff.

## STATEMENT OF FACTS

### A. The Professional Code of Conduct for Neurologists

12. A Board Certified Neurologist is bound by the American Academy of Neurology, Code of Professional Conduct, December 2009 ("AAN"):

> 1.2 Fiduciary and Contractual Basis
> The neurologists [*sic*] has fiduciary and contractual duties to patients. <u>As a fiduciary, the neurologist has an ethical duty to consider the interests of the patient first</u>. As a party to an implied contract, the neurologist has a duty to practice competently and to respect patients' autonomy, confidentiality, and welfare.
>
> 2.4 Patient Records
> The neurologist should <u>prepare records that include relevant history</u>, neurologic findings, assessment, and plan of evaluation and treatment. Patients are entitled to information within their medical records.
>
> 5.4 Health-Care Institutional Conflicts

3

> The neurologist generally should <u>support his patient's medical interests when they are compromised by policies of a health-care institution or agency</u>. Physicians employed by healthcare institutions should represent the patient's medical interests and serve as their <u>medical advocate to the institutional administration</u>.

AAN, emphasis added.

### B. Weill Cornell Medical Center, which is a Flagship Hospital in the NYP Network, Received at Least $999,999.00 in Insurance Payments for Critical Care Delivered to Plaintiff, Including the Phenobarbital Trial

13. Immediately prior to Plaintiff's admission to HHH, Plaintiff was as an inpatient at NewYork-Presbyterian/Weill Cornell Medical Center ("WCMC"). WCMC is a one of two flagship hospitals in the NYP Network.

14. On October 3, 2019, Plaintiff was admitted to WCMC as an inpatient-to-inpatient transfer from a previous hospital, for the purpose of treating Plaintiff for the medical condition of status epilepticus, which is a medical condition characterized by continual or highly frequent seizures.

15. At the time Plaintiff was admitted to WCMC on October 3, 2019, Plaintiff was sedated, and could be roused from that sedation.

16. A WCMC "Neurology Fellow Note" dated October 4, 2019 and concerning an electroencephalogram ("EEG") assessment, determined that Plaintiff had status epilepticus seizure activity focusing on the left hemisphere of the brain, and spreading "rarely to the right hemisphere".

17. A WCMC "Neuro ICU Admission Note" dated October 4, 2019 stated Plaintiff had "weakness on her right side", without specifically noting weakness on her left side.

18. On October 6, 2019, WCMC began to administer the drug phenobarbital to Plaintiff as treatment of Plaintiff's seizure activity.

4

19.     The American Geriatric Society's "Beers Criteria for Potentially Inappropriate Medication Use in Older Adults" considers phenobarbital as a potentially inappropriate medication for older adults, in part because of "greater risk of overdose at low dosages". Notably, the German PRISCUS list recommends that phenobarbital dosing for elderly adults "start at the lowest possible dose, up to half of usual dose, taper in".

20.     At the time WCMC administered phenobarbital to Plaintiff, she was 78 years old. Plaintiff is considered an older adult. WCMC did not administer reduced nor tapered dosages the phenobarbital dosages to Plaintiff. Rather, WCMC administered full dosages of phenobarbital to Plaintiff every day for eight (8) days, from October 6, 2019 to October 13, 2019.

21.     During the time period where WCMC administered full dosages of phenobarbital, Plaintiff experienced multiple medical emergencies.

22.     Nevertheless, WCMC continued to administer full dosages of phenobarbital until Plaintiff experienced acute liver injury on October 13, 2019. WCMC then consulted its Gastroenerology team.

23.     On October 14, 2019, WCMC reduced the phenobarbital dosages administered to Plaintiff.

24.     On October 15, 2019, WCMC discontinued administering phenobarbital to Plaintiff.

25.     At the time WCMC discontinued administering phenobarbital to Plaintiff on October 15, 2019, Plaintiff was in a comatose state.

26.     On November 1, 2019, Plaintiff had a JFK Coma Recover Score of 0/23.

27. A WCMC "Neurology Resident Chart Review", dated November 6, 2019, stated, "As phenobarb [sic] continues to wear off will get a better idea of new baseline" for the patient's mental status.

28. On November 18, 2019, seventeen (17) days later, Plaintiff had a JFK Coma Recover Score of 10/23.

29. A WCMC "Neurology Resident Chart Review" dated December 6, 2019 stated: "Rapid improvement in mental status may have initially been related to phenobarbital leaving system".

30. The abovementioned review further stated, "…patient being applied to TBI [i.e. Traumatic Brain Injury] rehab."

31. On December 6, 2019, Plaintiff was discharged from WCMC for transfer to HHH, which has a Traumatic Brain Injury ("TBI") rehabilitation program.

32. WCMC received at least $999,999.00 in Medicare and other insurance payments for the critical care services WCMC provided during Plaintiff's inpatient stay at that Hospital from October 3, 2019 to December 6, 2019.

## C. HHH Medically Mistreated Plaintiff and Mischaracterized Plaintiff's Medical Condition in Records for WCMC's Benefit

33. As a term of art, "acute rehabilitation" is defined as intensive rehabilitative therapy, typically for three (3) hours per day for five (5) days per week, provided in a hospital-level setting referred to as an inpatient rehabilitation facility.

34. As a term of art, "sub-acute rehabilitation" is defined as less intensive rehabilitative therapy, typically for one (1) to two (2) hours per day for five (5) days per week, provided in a skilled nursing facility.

6

35. A posting on a public web page maintained by HHH, dated July 12, 2011, and attributed to Dr. Seliger, described HHH's TBI rehabilitation program as distinct third option designed for the purpose of preparing a patient for acute rehabilitation:

> [HHH] offers a unique multifaceted Neurorecovery Program which includes diagnostic, treatment, and educational components… Intensive rehabilitation during a 30 to 60 day period enables patients who emerge to improve more rapidly and make better progress <u>when they are ready for acute rehabilitation</u>…
>
> The majority of patients who go through the Neurorecovery Program recover sufficiently so that they <u>are able to move on to acute rehabilitation</u>…

"Neurorecovery Program: helping patients emerge from coma", emphasis added.

36. The abovementioned web page makes no mention that a patient receiving 30 to 60 days of TBI rehabilitation is suitable for discharge to sub-acute rehabilitation; discussion of medically appropriate subsequent treatment refers only to preparing the patient for acute rehabilitation.

37. WCMC records plainly established that Plaintiff was discharged for transfer on the basis of a third option, which was Traumatic Brain Injury rehabilitation (see ¶ 30).

38. On December 6, 2019, Plaintiff was admitted to HHH as an inpatient-to-inpatient transfer from WCMC.

39. On December 6, 2019, HHH began to administer intensive rehabilitative therapy to Plaintiff as part of TBI rehabilitation.

40. On or about December 9, 2019, Plaintiff's son and Plaintiff's sister provided HHH case management with a December 29, 2009 health care proxy empowering each to act on Plaintiff's behalf. Plaintiff's son and Plaintiff's sister are hereinafter referred to as "Plaintiff's Proxies".

7

41. On or about January 27, 2020, HHH case management verbally informed Plaintiff's Proxies that HHH had decided to issue a discharge recommendation for sub-acute rehabilitation for Plaintiff on January 29, 2020. That discharge decision reflected a 54-day hospital stay for Plaintiff at HHH.

42. On or about January 27, 2020, HHH case management further verbally informed Plaintiff's Proxies that the medical rationale for the discharge decision would only be made available to the Plaintiff's Proxies if they appealed HHH's decision.

43. On January 28, 2020, HHH case management provided Plaintiff's Proxies with a form entitled "An Important Message From Medicare About Your Rights" (Form CMS-R-193, expiring on March 31, 2020).

44. The abovementioned form stated: "You also have the right to an appeal [of a hospital discharge decision], that is, a review of your case by a Quality Improvement Organization (QIO)… <u>You will receive a detailed notice of from the hospital… that explains the reasons they think you are ready to be discharged</u>" (emphasis added).

45. On January 29, 2020, Plaintiff's Proxies initiated a 1st level Medicare discharge appeal by calling the QIO and leaving a message requesting an appeal.

46. On February 6, 2020, HHH case management issued a "Detailed Notice of Discharge", dated January 29, 2020, which stated at the outset:

> You have asked for a review by the Quality Improvement Organization (QIO), an independent reviewer hired by Medicare to review your case. This notice gives you a detailed explanation about why your hospital… <u>in agreement with your doctor</u>, believe that your inpatient hospital services should end on 01/29/2020. This is based on Medicare coverage policies listed below <u>and. your medical condition</u>.

Detailed Notice of Discharge, emphasis added.

47. Under the section entitled "Specific information about your current medical condition" in the "Detailed Notice of Discharge", HHH wrote nothing. There was no information explaining the medical rationale for HHH's discharge decision. The "Detailed Notice of Discharge" contained no information whatsoever specific to Plaintiff, aside from identifying information.

48. On February 6, 2020, Plaintiff's Proxies verbally notified Dr. Seliger of their concern that Plaintiff required acute rehabilitation to recover from, *inter alia*, the toxic and/or adverse effects of the phenobarbital administered by WCMC.

49. Dr. Seliger did not act on the abovementioned notification.

50. On February 14, 2020, the QIO issued a decision denying Plaintiff's 1st Level appeal (1st Level Decision). There is no indication at all in the QIO's 1st Level Decision, that Dr. Seliger informed the QIO that Plaintiff received phenobarbital.

51. On February 15, 2020, the Plaintiff's Proxies initiated a 2nd Level appeal with the QIO.

52. On February 20, 2020, the QIO issued a decision denying Plaintiff's 2nd Level appeal (2nd Level Decision). There is also no indication at all in the QIO's 2nd Level Decision, that Dr. Seliger informed the QIO that Plaintiff received phenobarbital.

53. The 2nd Level Decision did note Plaintiff's need for further intensive rehabilitative therapy: "Transfer to facility of lower acuity is appropriate at this time <u>for further intensive therapy</u>" (emphasis added).

54. The 2nd Level Decision further stated: "To exercise your right to appeal, you must file a written request for an [Administrative Law Judge] hearing within 60 days of receiving this letter." There is a presumption of 5 calendar days for receipt of a document. The

9

QIO 2nd Level Decision is dated February 20, 2020; 65 calendar days from that date is April 25, 2020, which was therefore the deadline to request an ALJ hearing on the 2nd Level Decision.

55. The 2nd Level Decision stated that HHH received a copy of the 2nd Level Decision.

56. On February 20, 2020, Plaintiff's Proxies again verbally reiterated to Dr. Seliger their concern that Plaintiff required acute rehabilitation to recover from, *inter alia*, the toxic and/or adverse effects of the phenobarbital administered by WCMC.

57. This time, Dr. Seliger responded to the Plaintiff Proxies' second notification by stating he never received any medical records from WCMC related to the phenobarbital.

58. On February 21, 2020, Plaintiff's Proxies provided Dr. Seliger with WCMC medical records related to the WCMC's administration of phenobarbital to Plaintiff (see records defined *supra* ¶¶ 16, 17, 27, 29).

59. On February 21, 2020, immediately after Dr. Seliger was made aware of those records, HHH discontinued intensive rehabilitative therapy for Plaintiff, even though that intensive rehabilitative therapy was medically necessary to Plaintiff.

60. On February 24, 2020, Plaintiff's Proxies contacted the QIO, seeking mediation seeking to have HHH reinstate medically necessary intensive rehabilitative therapy for Plaintiff.

61. On February 25, 2020, HHH notified Plaintiff's Proxies by email: "As per the team's understanding, when we have received written proof/contact of a Medicare 3rd level appeal, we will then reinstate any necessary therapy services to the patient. At this time we have no official information from Medicare or any other agency regarding any further appeals."

62. On February 26, 2020, in the morning, Plaintiff's Proxies notified HHH by email: "Please reinstate all necessary therapy services to the patient. As per your request below, this email notifies Helen Hayes Hospital of our intent to file a 3rd level appeal...".

63. A Progress Note by Dr. Seliger dated February 26, 2020 specifically identified Plaintiff's need for an "intensive interdisciplinary therapy program" as an intervention necessary to modify barriers to Plaintiff's discharge.

64. On February 28, 2020, the QIO notified Plaintiff's Proxies that HHH was unwilling to engage in mediation related to restoration of Plaintiff's medically necessary therapies.

65. On February 28, 2020, Plaintiff's Proxies objected to HHH's administration, namely, case management, regarding HHH's refusal to resolve the matter of Plaintiff's urgent medical need for intensive rehabilitative therapy: "While [HHH] has withheld medically necessary therapies, we have personally observed the patient has experienced increased stiffness... Moreover, the patient has observed the discontinuation of medically necessary therapies by [HHH], this observation has diminished her mental sense of wellbeing."

66. On March 4, 2020, by email to HHH's patient relations, Plaintiff's Proxies ststed: "We are seeking to discharge the patient to an inpatient rehabilitation facility capable of providing the complex rehabilitation therapy necessary to treat the toxic and/or adverse effects of phenobarbital. However, it is impossible to obtain hospital admission and insurance coverage for an undiagnosed condition."

67. On March 4, 2020, Dr. Seliger verbally informed Plaintiff's Proxies that he was reviewing the records from WCMC, which Plaintiff's Proxies had provided to Dr. Seliger almost two (2) weeks earlier, on February 21, 2020.

11

68. A Progress Note by Dr. Seliger, dated March 6, 2020, makes no mention of phenobarbital at all, despite Dr. Seliger being in possession of the relevant WCMC medical records since February 21, 2020.

69. On March 11, 2020, by email, Plaintiff's Proxies sent the following notification to HHH case management:

> Under Medicare rules, the patient had until April 25, 2020 to file a 3rd level discharge appeal. However, as stated by Helen Hayes Hospital below, the patient would not receive any necessary therapy services until she filed that appeal. Out of concern for the patient's health and wellbeing, we have filed a 3rd level appeal today, March 11, 2020. A copy of that appeal has been mailed to Helen Hayes Hospital. I will deliver a copy by hand upon arrival at the Hospital.

70. On March 11, 2020, Plaintiff's son, as one of Plaintiff's Proxies, personally hand delivered a copy of the application for a hearing to Dr. Seliger.

71. On March 11, 2020, Plaintiff's Proxies personally observed Plaintiff suffering pain in her legs, and Dr. Seliger examined Plaintiff's leg pain. Plaintiff's Proxies expressed the concern that the Plaintiff's leg pain was new and likely due to the inactivity arising from the lack of medically necessary therapies. Dr. Seliger prescribed anti-inflammatory drugs for Plaintiff's leg pain.

72. As of the date of the filing of this complaint, HHH has not reinstated the medically necessary intensive rehabilitative therapy, which HHH has withheld from Plaintiff for more than three (3) weeks, since February 21, 2020.

**COUNT I: ARBITRARY AND UNCONSCIONABLE WITHHOLDING OF MEDICAL CARE**

73. Plaintiff re-alleges and incorporates by reference allegations contained in paragraphs 1 through 72 above as though fully set forth herein.

74. A person can bring an action against a person acting under color of state for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" (42 U.S.C. § 1983).

75. The Fourteenth Amendment due process and equal protection of law provisions protect an individual from arbitrary and unconscionable action by state government.

76. An appellant has "[w]ithin 60 calendar days from the date the party receives notice" of a 2nd level Medicare decision to request an appeal hearing before an administrative law judge (see 42 CFR § 405.1014(c)(1)).

77. One day after the 2nd Level Decision was issued, HHH withheld medically necessary therapies, and subsequently stated that those medically necessary therapies would not be reinstated until Plaintiff filed a request for an appeal. Even after Plaintiff's Proxies expedited the filing of that the 3rd Level Appeal on March 11, 2020 out of concern for the Plaintiff's health and safety, HHH still did not reinstate the medically necessary therapies.

78. Moreover, Dr. Seliger continues to have an ethical obligation to serve as the Plaintiff's "medical advocate to the institutional administration" (see *supra* ¶ 12). However, Dr. Seliger has taken no action at all to advocate that Plaintiff receive medically necessary therapy as Plaintiff exercises her due process rights to appeal.

79. Therefore, HHH and Dr. Seliger, under color of state, have arbitrarily and unconscionably withheld medical care for the illegitimate purpose of interfering with or obstructing Plaintiff's due process rights to a Medicare appeal hearing before an administrative law judge.

**COUNT II: ARBITRARY AND UNCONSCIONABLE DISCHARGE HANDLING**

80. Plaintiff re-alleges and incorporates by reference allegations contained in paragraphs 1 through 79 above as though fully set forth herein.

81. The relevant Medicare regulations governing a hospital issuing a detailed discharge notice is as follows:

> When a QIO notifies a hospital that a beneficiary has requested an expedited determination, the hospital must deliver a detailed notice to the beneficiary as soon as possible but no later than noon of the day after the QIO's notification. The detailed notice must include the following information:
>
> (i) A detailed explanation why services are either no longer reasonable and necessary or are otherwise no longer covered…
>
> (iii) Facts specific to the beneficiary and relevant to the coverage determination that are sufficient to advise the beneficiary of the applicability of the coverage rule or policy to the beneficiary's case…

42 C.F.R. § 405.1206(e)(1).

82. The "Detailed Notice of Discharge" that HHH issued to Plaintiff contained no explanation of HHH's rationale for discharge, and provided no facts that were specific to Plaintiff's discharge.

83. Notably, HHH's decision to discharge Plaintiff without referring Plaintiff to further acute rehabilitation was inconsistent with Dr. Seliger's own publically stated medical purpose of HHH TBI Rehabilitation Program for a patient "to move on to acute rehabilitation".

84. HHH disregarded its responsibilities in the discharge process in an arbitrary and capricious manner, pursuant to 42 C.F.R. §§ 405.1206(e)(1)(i) and (iii).

85. Moreover, Dr. Seliger had an ethical obligation as a fiduciary to "prepare records that include relevant history" (see *supra* ¶ 12).

86. However, during the discharge planning process, Dr. Seliger did not enter any of Plaintiff's relevant history related to phenobarbital, even though Dr. Seliger had received the

relevant medical records describing the rapid recovery of Plaintiff's mental status as phenobarbital left her system.

87. Dr. Seliger failed in his ethical fiduciary obligations to Plaintiff during the discharge process, with regard to the preparation of Plaintiff's medical records maintained by HHH.

88. Further, Dr. Seliger had an ethical obligation to "support his patient's medical interests when they are compromised by policies of a health-care institution or agency" (see *supra* ¶ 12).

89. However, Dr. Seliger's omission of any discussion of the phenobarbital is beneficial to the interests WCMC, a flagship hospital in the NYP Network, in that HHH and Dr. Seliger are also affiliated with the NYP Network. WCMC received at least $999,999.00 in Medicare and other insurance payments for the critical care provided to Plaintiff, which included WCMC's administration of phenobarbital to Plaintiff. Any statement that phenobarbital adversely impacted Plaintiff's health would automatically place the validity of those payments in jeopardy.

90. Dr. Seliger's willful omission of the phenobarbital from the Patient's medical records maintained by HHH constitutes an unethical compromise of Plaintiff's medical interest for records containing relevant and accurate medical history information.

91. Therefore, HHH and Dr. Seliger, under color of state, engaged in, and are continuing to engage in, the abovementioned arbitrary and unconscionable governmental actions related to Plaintiff's discharge while disregarding Medicare notification rules and the relevant professional codes of conduct.


## PRAYER

WHEREFORE, Plaintiff Jane Doe prays for judgment against Defendants as follows:

1. Reinstatement of intensive rehabilitative therapy, which is to be delivered by HHH to Plaintiff in the same manner as previously provided from December 6, 2019 until on or about February 21, 2020.

2. Nullification of the January 29, 2020 "Detailed Notice of Discharge" issued in an arbitrary and capricious manner that disregarded 42 C.F.R. § 405.1206(e)(1).

3. For general damages jointly and severally against Defendants according to proof.

4. For punitive damages jointly and severally against Defendants according to proof.

5. That Plaintiff be awarded all costs of this action, including attorneys' fees and expenses; and

6. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Jane Doe hereby demands a trial by jury.

Respectfully submitted this the ___16___ day of _____March_____, 2020.


*[signature]*

Thuy Q. Pham
New York State Bar No. 5032149
Badge No. 25230
The Law Office of Thuy Q. Pham
225 West 23rd Street, #6G
New York, NY 10011
Phone: 917.532.2991
Fax: 509.275.3004
Email: thuyqpham1@gmail.com
Counsel for Jane Doe

## VERIFICATION

State of New York   )
                   ) ss:
County of New York )

    I, FUMBEYA MARUNGO, have the Power of Attorney over Plaintiff in the above entitled proceeding. I have read the foregoing Verified Complaint for Violation of Civil Rights and Jury Demand and know the contents thereof. The contents are true to my own knowledge except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

                                                         */s/ Fumbeya Marungo*
                                                         Fumbeya Marungo

Subscribed and sworn to before me
on this 16th day of March, 2020

*/s/ Thuy Q. Pham*

NOTARY PUBLIC

        THUY Q. PHAM
   Notary Public, State of New York
        No. 02PH6259818
   Qualified in New York County
Commission Expires April 16, 2022

17