UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JANE DOE,

                Plaintiff,

      -against-

KATHLEEN MARTUCCI, et al.,

                Defendants.

---

**OPINION AND ORDER**

20-CV-02331 (PMH)

---

PHILIP M. HALPERN, United States District Judge:

Jane Doe ("Plaintiff") commenced this action alleging claims against a number of employees from the New York State Department of Health ("DOH") and/or Helen Hayes Hospital ("HHH"), a facility owned by the DOH, in connection with, *inter alia*, her discharge from HHH and transfer to an acute-care hospital. (Doc. 1). The operative pleading—the Second Amended Complaint—presses twelve claims for relief against Kathleen Martucci ("Martucci"), Glenn M. Seliger, M.D. ("Seliger"), Jacqueline Velez ("Velez"), Linda Egenes ("Egenes"), and John Mathew ("Mathew" and collectively, "Defendants"), under 42 U.S.C. § 1983, sounding in procedural and substantive due process violations, as well as state law claims. (Doc. 39, "SAC").[1]

---

[1] The Second Amended Complaint named additional defendants, however, on September 13, 2021, the Court dismissed the Estate of Kwang (Ed) Ng pursuant to Federal Rule of Civil Procedure 4(m) (Doc. 65); on December 16, 2022, the Court granted a motion to substitute defendant Marjorie King, M.D., pursuant to Federal Rule of Procedure 25(d), with Glenn M. Seliger, M.D., in his official capacity (Doc. 146); and on December 30, 2022, the Court granted a request by Plaintiff to drop as defendants Rosemary Galvin and Christine Kehoe. (Doc. 150). Plaintiff continues to press her claims against "1-100 John Roes," (*see generally* SAC), however, there is no indication that these individuals have been identified or served. Any claims against these unknown actors must, at this juncture, be—and are hereby—dismissed without prejudice for failure to prosecute. "Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice." *Delrosario v. City of New York*, No. 07-CV-02027, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010); *see also Vanderwoude v. City of New York*, No. 12-CV-09046, 2014 WL 2592457, at *8 (S.D.N.Y. June 10, 2014).

The Court, on September 13, 2021, denied Defendants' motion to dismiss the Second Amended Complaint. (Doc. 65).[2] Defendants filed an Answer to the Second Amended Complaint on November 5, 2021 (Doc. 70), and the parties thereafter engaged in discovery.

Now pending before the Court are the parties' dueling motions for summary judgment. Defendants filed their motion for summary judgment in accordance with the briefing schedule set by the Court. (Doc. 183; Doc. 184; Doc. 185, "Def. Br."). Plaintiff, in a single brief as directed by the Court, opposed Defendants' motion and cross-moved for summary judgment in her favor. (Doc. 187; Doc. 188; Doc. 189, "Pl. Br."). Defendants filed, in a single brief as directed by the Court, their opposition to Plaintiff's motion and reply in further support of their motion. (Doc. 186, "Def. Reply"). Plaintiff, with the Court's permission, filed reply papers in further support of her motion for summary judgment. (Doc. 192, "Pl. Reply"; Doc. 193; Doc. 194). On January 31, 2024, Plaintiff supplemented the extant briefing with a letter sent to her from the Medicare Appeals Council. (Doc. 220). Defendants, at the Court's direction, filed a response thereto on February 8, 2024. (Doc. 222).

Also pending before the Court is Plaintiff's fully-submitted "Motion for Relief from an Order Preventing Plaintiff from Filing a Rule 11 Motion for Sanctions." (Doc. 176; Doc. 204; Doc. 207).

For the reasons set forth below, Defendants' motion for summary judgment is GRANTED and Plaintiff's motion for summary judgment is DENIED. Plaintiff's motion for relief from the Court's prior order is likewise DENIED.

---

[2] This decision is also available on commercial databases. *See Doe v. King*, No. 20-CV-02331, 2021 WL 4198275 (S.D.N.Y. Sept. 13, 2021).

## BACKGROUND

The Court recites the facts herein only to the extent necessary to adjudicate the extant motion for summary judgment and draws them from the pleadings, Defendants' Rule 56.1 Statement and Plaintiff's responses thereto (Doc. 172, "56.1"),[3] and the admissible evidence proffered by the parties. Unless otherwise indicated, the facts cited herein are undisputed.

Plaintiff was taken by ambulance to Jamaica Hospital for a left-sided subdural hematoma on September 30, 2019. (56.1 ¶ 9). Plaintiff underwent surgery and was diagnosed with severe status epilepticus, a condition exhibited by recurrent seizures, which caused significant neurological deficits. (*Id*. ¶ 10). She was transferred to New York Presbyterian Hospital ("NYP") on October 3, 2019, where she underwent additional surgery and was administered anti-seizure medications, including phenobarbital. (*Id*. ¶ 11). NYP discontinued phenobarbital on October 14, 2019. (*Id*. ¶ 12). When NYP was ready to discharge Plaintiff, Plaintiff's son and Plaintiff's sister (together, the "Proxies") felt it was "premature." (*Id*. ¶¶ 8, 14). The Proxies were advised not to "delay initiating the discharge process longer than is necessary." (*Id*. ¶ 14). The Proxies continued to refuse "to apply for rehab of any type," were advised about non-coverage for Medicare, then, following an "ethics review," were instructed that they did not "have the right to dictate inappropriate care or unsafe/unreasonable discharge options." (*Id*.). After discharge from NYP, Plaintiff was admitted to HHH on December 6, 2019. (*Id*. ¶ 16).

Upon admission to HHH, Plaintiff could not move her limbs or talk, had a feeding tube and a tracheostomy for breathing, and was dependent for all daily activities. (*Id*. ¶¶ 17, 18). Plaintiff's son, as her proxy, signed and agreed to comply with the terms and conditions of the

---

[3] At the April 19, 2023 pre-motion conference, the Court granted the parties leave to identify and correct typographical errors in the Rule 56.1 Statement through footnotes in their memoranda of law. Defendants provided such revisions in their moving brief and the Court hereby deems those revisions incorporated into the Rule 56.1 Statement by reference. (Def. Br. at 9 n.1).

HHH Admission Consents and Written Disclosure Statement, including "transfer to another facility if considered necessary for proper medical care"; and consent to "use and disclose [Plaintiff's] health information for treatment, payment and health care operations." (*Id*. ¶ 21).

In December 2019, during at least two meetings with Mathew, Plaintiff's case manager, the Proxies discussed and expressed being agreeable to Plaintiff's transfer to a skilled nursing facility ("SNF") when Plaintiff was ready for discharge, and Mathew provided a list of SNFs from which to choose. (*Id*. ¶ 26). While at HHH, Plaintiff made progress in various domains of function. (*Id*. ¶ 28). On or about January 23, 2020, Seliger and other members of Plaintiff's treatment team determined that Plaintiff was medically stable for discharge to a subacute facility in a week. (*Id*. ¶ 30). On January 27, 2020, Mathew informed the Proxies that Plaintiff was "ready for discharge [on] 01/29." (*Id*. ¶ 31). Plaintiff's son, however, "declined to choose *more* SNFs" for Plaintiff's discharge. (*Id*. ¶ 32 (emphasis in original response)). On January 28, 2020, Plaintiff's son was again given "An Important Message from Medicare" explaining Plaintiff's rights to appeal the decision to discharge. (*Id*. ¶ 34).

On or about February 6, 2020, Plaintiff appealed her discharge to Livanta, which is an independent quality improvement organization ("QIO") contracted by Medicare to review discharge appeals. (*Id*. ¶ 35). During the appeal, Plaintiff remained a patient at HHH. (*Id*. ¶ 36). On February 12, 2020, Mathew advised Plaintiff's son that the Isabella SNF had "medically accepted pt and offered a bed," but Plaintiff's son "declined the offer." (*Id*. ¶ 37). On February 14, 2020, Livanta denied Plaintiff's appeal, concluding that HHH's decision to discharge was appropriate and Medicare would not pay for any inpatient services at HHH beginning on February 15, 2020 at noon. (*Id*. ¶ 38). On February 15, 2020, Plaintiff filed a second discharge appeal to Livanta. (*Id*. ¶ 39). On February 20, 2020, Livanta denied Plaintiff's second appeal, finding that a

continued stay at HHH was not medically necessary and that "transfer to a facility of lower acuity is appropriate at this time for further intensive therapy." (*Id.* ¶ 41). Livanta's denial of Plaintiff's second appeal was later upheld by an Administrative Law Judge ("ALJ") at the office of Medicare Hearings on Appeals, who concluded that "transfer to a [SNF] was appropriate for [Plaintiff's] continued care at a subacute care facility." (*Id.* ¶ 42). Plaintiff, at some point thereafter, filed an appeal of the ALJ's decision to the Medicare Appeals Council ("MAC").  (*Id.* ¶ 43; Doc. 184-11 at 35:16-36:19; Doc. 220-1).

On March 6, 2020, Martucci, the HHH Chief Operating Officer, after consultation with Seliger and the State Attorney General, filed a petition for the appointment of a guardian for Plaintiff to effectuate a safe discharge because Plaintiff's Proxies continued to refuse discharge. (Doc. 184-42; Doc. 184-28 at 46:13-25). The petition explained that Plaintiff's continued stay at HHH placed her at risk for adverse health issues, which included unnecessary exposure to hospital acquired antibiotic resistant organisms. (Doc. 184-42 ¶ 15). The guardianship petition was filed under temporary seal pursuant to Mental Hygiene Law § 81.14(b). (*See id.* ¶ 27; *id.* at 15). With respect to Plaintiff's medical status, the petition stated that Plaintiff had been diagnosed with traumatic brain injury, subdural hematoma, status epilepticus, and cognitive impairment; "required total care with all activities of daily living and skilled nursing care for wound care and medication administration"; and listed her medications. (*Id.* ¶¶ 5, 16). HHH withdrew the sealed Guardianship Petition on April 21, 2020, and no guardian was appointed for Plaintiff. (56.1 ¶ 58).

Plaintiff commenced this litigation on March 16, 2020. (Doc. 1). As of September 2022, Plaintiff lives on the second floor of her home, and is able to climb stairs with assistance, communicate verbally, ambulate around the house, talk on the phone with friends, read the newspaper, watch television, do light cooking, and is "doing fairly well." (56.1 ¶ 70).

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, No. 17-CV-3875, 2020 WL 917294, at *4 (S.D.N.Y. Feb. 26, 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).[4] "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-5486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). "The question at summary judgment is whether a genuine dispute as to a *material* fact exists—not whether the parties have a dispute as to any fact." *Hernandez v. Comm'r of Baseball*, No. 22-343, 2023 WL 5217876, at *5 (2d Cir. Aug. 15, 2023); *McKinney v. City of Middletown*, 49 F.4th 730, 737 (2d Cir. 2022)).

The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence. *Porter v. Dartmouth-Hitchcock Medical Center*, No. --- F.4th ----, 2024 WL 439465, at *14 (Feb. 6, 2024) ("[T]he court may not make credibility determinations or weigh the evidence." (quoting *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010))). The task is material issue spotting, not material issue determining.

---

[4] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial." *Bellotto v. Cnty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)).

"It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). The Court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)). Further, "while the court is required to review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Porter*, 2024 WL 439465, at *14 (quoting *Kaytor*, 609 F.3d at 545). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 2020 WL 917294, at * 4 (quoting *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts." *Id.* (quoting *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, if "there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law. *See Glover v. Austin*, 289 F. App'x 430, 431 (2d Cir. 2008) ("Summary judgment is appropriate if, but only if, there are no genuine issues of material

fact supporting an essential element of the plaintiffs' claim for relief."); *Pimentel v. City of New York*, 74 F. App'x 146, 148 (2d Cir. 2003) (holding that because plaintiff "failed to raise an issue of material fact with respect to an essential element of her[ ] claim, the District Court properly granted summary judgment dismissing that claim"). Simply put, the movant must separately establish that the law favors the judgment sought.

## ANALYSIS

I.   Motions for Summary Judgment

A.   First through Fifth Claims for Relief

Plaintiff characterizes her case as "a straightforward civil rights action." (Pl. Br. at 9). The First through Fifth Claims for Relief are styled as follows: (1) "Deprivation of Liberty Interest in Discharge Planning"; (2) "Deprivation of Liberty Interest in Medical Information Necessary for Making an Informed Decision"; (3) "Deprivation of Property Interest in a Discharge Memorialization"; (4) "Deprivation of Liberty Interest in Medical Care"; and (5) "Deprivation of Property Interest in an Intensive Rehabilitative Therapy Level of Care." (*See generally* SAC). Defendants argue that this is not in fact a civil rights action; rather, these claims are mere disputes with the Secretary of Health and Human Services disguised as constitutional claims. Defendants therefore move to dismiss because, *inter alia*, Plaintiff failed to exhaust administrative remedies under the Medicare Act, 42 U.S.C. § 1395, *et seq*. (Def. Br. at 10-16). Plaintiff counters that her claims do not arise under the Medicare Act and, because Defendants are state, not federal, employees, the Medicare Act does not apply. (Pl. Br. at 11-12).

The Medicare Act eliminates federal question jurisdiction over lawsuits brought "to recover on any claim arising under" Medicare. *See* 42 U.S.C. § 405(h) ("No action against the United States . . . or any officer or employee thereof shall be brought under section 1331 or 1346

of title 28 to recover on any claim arising under this subchapter."); *id*. § 1395ii (incorporating § 405(h) into the Medicare statute); *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 10 (2000). "Judicial review of claims arising under the Medicare Act is available only after the Secretary [of Health and Human Services] renders a 'final decision' on the claim . . . ." *Heckler v. Ringer*, 466 U.S. 602, 605 (1984).

The Court's first inquiry with respect to Plaintiff's first five claims for relief is whether they "'arise[ ] under' the Medicare Act such that Section 405(h)'s administrative channeling requirement applies." *Retina Grp. of New England, P.C. v. Dynasty Healthcare, LLC*, 72 F.4th 488, 495 (2d Cir. 2023). If the first inquiry is answered in the affirmative, the Court must determine whether Plaintiff has satisfied the channeling requirements by properly presenting the claim and exhausting the appropriate administrative channels. *Id*. at n.2 (setting forth the test to determine whether a court has subject matter jurisdiction to hear a claim related to Medicare (quoting *Sensory Neurostimulation, Inc. v. Azar*, 977 F.3d 969, 976 (9th Cir. 2020))).

     *i.*   *"Arising Under" the Medicare Act*

The "arising under" language of Section 405(h) is exceptionally broad, channeling "most, if not all, Medicare claims" through the system of administrative review. *Id*. at 497 (quoting *Illinois Council*, 529 U.S. at 8). Courts therefore must include in the "arising under" analysis "claims that are 'inextricably intertwined with what . . . is in essence a claim for benefits.'" *Id*. (quoting *Heckler*, 466 U.S. at 615, 624). And, "[b]ecause the channeling provision is broader than the kinds of claims that can be brought under the Act . . . this principle holds even if the agency cannot 'fully resolve' the set of claims." *Id*. at 495 (internal citation omitted) (quoting *Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107, 1115 n.4 (9th Cir. 2003)).

"The Courts of Appeals advise that courts should be wary of claims that are 'cleverly concealed claims for benefits.'" *Potts v. Rawlings Co., LLC*, 897 F. Supp. 2d 185, 192 (S.D.N.Y. 2012) (quoting *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1141 (9th Cir. 2010)). As relevant here, claims alleging that Medicare regulations were "misapplied or ignored" arise under the Medicare Act and are subject to the exhaustion requirement. *Caremark Therapeutic Servs. v. Thompson*, 244 F. Supp. 2d 224, 227 (S.D.N.Y.), *aff'd*, 79 F. App'x 494 (2d Cir. 2003); *see also Abbey v. Sullivan*, 788 F. Supp. 165, 170 (S.D.N.Y.), *aff'd*, 978 F.2d 37 (2d Cir. 1992).

The First through Fifth Claims for Relief alleged in the Second Amended Complaint arise under the Medicare Act, despite being pled as due process claims. Plaintiff alleges that she, as a Medicare beneficiary, has a "statutorily mandated right to expedited determinations and expedited reconsiderations to appeal a hospital discharge" (SAC ¶¶ 39-40), quoting the Medicare Act and Medicare Claims Processing Manual in her pleading. (*See, e.g., id.* ¶¶ 39-44). Each of the First through Fifth Claims for Relief allege that Defendants' acts or omissions were done for the purpose of "harming or prejudicing Plaintiff['s] financial interests." (*Id.* ¶¶ 231, 239, 245, 252, 262). She alleges that Defendants "improperly and prematurely suspended Plaintiff's intensive rehabilitative therapy" and "withheld necessary therapy services" in order to protect an affiliated hospital that administered the phenobarbital. (*Id.* ¶¶ 138, 140). Plaintiff alleges that HHH sought $143,974.89 in payment while denying Plaintiff the "further intensive therapy" she sought. (*Id.* ¶ 217). Quite clearly, the thrust of these claims are claims for benefit payments to cover the cost of her stay at HHH when her coverage ceased and for further Medicare benefits in the form of further intensive therapy.

More specifically, Plaintiff's First Claim for Relief alleges that Defendants failed to follow Medicare regulations concerning discharge planning. (SAC ¶¶ 228-231). The Second Claim for

Relief alleges that Defendants provided inadequate information concerning diagnostic or treatment rehabilitative services in relation to Plaintiff's phenobarbital and critical illness myopathy. (SAC ¶¶ 234-239). Plaintiff's Third Claim for Relief alleges that Defendants failed to follow Medicare regulations regarding the discharge notice (CMS-10066). (*Id.* ¶¶ 242-244). The Fourth Claim for Relief alleges that Defendants failed to properly arrange for further intensive therapy for Plaintiff upon her discharge. (*Id.* ¶¶ 248-252). Plaintiff's Fifth Claim for Relief alleges that Defendants should not have sought to discharge her to a lower level of care because she required further "acute-level" or inpatient rehabilitation facility ("IRF") level of care due to the effects of phenobarbital and critical illness myopathy. (*Id.* ¶¶ 258-262). Thus, although her First through Fifth Claims for Relief are labeled as constitutional due process claims, they are, in fact, claims for further Medicare benefits.

     *ii.*    *Exhaustion of Administrative Review*

Because the Court concludes that Plaintiff's First through Fifth Claims for Relief arise under the Medicare Act, the Court must next determine whether Plaintiff has satisfied the channeling requirements, *Retina Grp. of New England, P.C.*, 72 F.4th at 495 n.2, by pressing her claims through all four levels of the relevant Medicare administrative appeals process[5] and obtaining a final decision from the Secretary before bringing her claims in federal court. *Heckler*, 466 U.S. at 606.

The "final decision from the Secretary" requirement is said to be comprised of "two elements, one jurisdictional (non-waivable) and one prudential (waivable)." *Abbey*, 978 F.2d at 43 (citing *Bowen v. City of New York*, 476 U.S. 467, 483 (1986) and *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976)). "The non-waivable, jurisdictional element is the requirement that a claim for

---

[5] There are four levels of administrative review before a plaintiff can access judicial review in a case such as this one. *See* 42 C.F.R. § 405.904(a)(1).

benefits first be presented to the Secretary. The waivable, prudential element is the requirement that the administrative remedies prescribed by the Secretary be exhausted before judicial review is available." *Id*. The exhaustion requirement may be judicially waived where: (1) the claim is collateral to a demand for benefits; (2) exhaustion would be futile; or (3) Plaintiff would suffer irreparable harm if required to exhaust administrative remedies before obtaining relief. *See id*. at 45.

On or about February 6, 2020, Plaintiff appealed her discharge to a QIO contracted by Medicare to review discharge appeals. (56.1 ¶ 35). On February 14, 2020, the QIO denied Plaintiff's appeal, concluding that HHH's decision to discharge was appropriate. (*Id*. ¶ 38). On February 15, 2020, Plaintiff filed a second discharge appeal to the QIO. (*Id*. ¶ 39). On February 20, 2020, Plaintiff's second appeal was denied. (*Id*. ¶ 41). The denial was later upheld by the ALJ at the office of Medicare Hearings on Appeals. (*Id*. ¶ 42). Plaintiff completed only the first three levels of the administrative appeals process. (*Id*. ¶¶ 35, 38-42). Plaintiff, at some point thereafter, appealed the decision of the ALJ, which may or may not have been timely filed,[6] and which purported appeal remains ongoing. (*Id*. ¶ 43; Doc. 184-11 at 35:16-36:19).

Indeed, on January 31, 2024, Plaintiff filed a letter representing to the Court that the MAC granted her "30 days' leave to file a timely Medicare appeal brief." (Doc. 220). The letter from the MAC annexed to Plaintiff's correspondence, however, states only that the MAC "grants [Plaintiff] an extension of time to review the record and submit a supplemental brief . . . [and] will defer action for a period of 30 days from [January 5, 2024]." (Doc. 220-1). The letter does not state that

---

[6] Although Plaintiff disputes the timeliness of her purported fourth-level appeal, she did not on these motions proffer any proof of having initiated a timely fourth-level appeal to the MAC, beyond the deposition transcript of Plaintiff's son who simply testified an appeal to the MAC was made and ongoing. (Doc. 184-11 at 35:16-36:19). Martucci has declared, as Chief Operating Officer at HHH, that to her knowledge Plaintiff did not appeal the July 1, 2020 ALJ decision. (*See* Doc. 184-34 ¶ 2).

Plaintiff's appeal was accepted or deemed timely, or that she was granted "leave to file a timely Medicare appeal brief" as stated by Plaintiff. (*Compare* Doc. 220 *with* Doc. 220-1). Importantly, even if the MAC were to deem the appeal timely filed, Plaintiff was required to obtain a final agency decision in order to satisfy the exhaustion requirement applicable to her claims. *See Heckler*, 466 U.S. at 605, 606 ("Judicial review of claims arising under the Medicare Act is available only after the Secretary [of Health and Human Services] renders a 'final decision' on the claim . . . ." A claimant obtains a "final decision" from the Secretary "only after [he] has pressed his claim through all designated levels of administrative review.").

Although Plaintiff has repeatedly conceded that she has not yet obtained a final decision, she argues that because her claims are alleged against state employees, they are not subject to the exhaustion requirement. (Pl. Br. at 11-12). As Plaintiff points out, the Second Circuit, in *Ellis v. Blum*, recognized that on its face, the statute's "ban on actions 'against the United States, the Secretary, or any officer or employee thereof' does not apply to a suit against state officials." 643 F.2d 68, 76 (2d Cir. 1981) (quoting 42 U.S.C. § 405(h)). But the Court went on to explain that state officials acting as agents of the Secretary would in fact fall within the scope of the ban, because "[t]o hold otherwise arguably would invite applicants for Title II benefits to circumvent §§ 405(g) and (h) by bringing suit under § 1331 against the state officials instead of the Secretary . . ." *Id.* ("[W]e have little doubt that, for the reasons indicated, the scope of § 405(h) extends to suits in which claims against state officials are merely disguised disputes with the Secretary of the sort described in §§ 405(g) and (h) . . .").

The Ninth Circuit, in *Morales v. Providence Health*, confronted with a similar argument, held that "a suit by a Medicare beneficiary against a private entity" where the plaintiff was "not seeking review of any decision of the Secretary and [was] not suing the United States, the

Secretary, or any officer or employee thereof," was still subject to the exhaustion requirement because the plaintiff's claims arose under the Medicare Act. 702 F. App'x 550, 552 (9th Cir. 2017). Plaintiff's reliance on 42 U.S.C. § 1395 is unpersuasive: her argument that this federal law prohibits Defendants from being "mere agents" of the Secretary is absent from the statutory text and lacks any case law support. Rather, the Second Circuit in *Ellis* expressly acknowledged that the exhaustion requirement could apply to claims against state actors, and the Ninth Circuit in *Morales* held the exhaustion requirement applicable to claims against a physical therapy provider.

Plaintiff devotes one sentence in her opposition brief to the proposition that the exhaustion requirement may be judicially waived, contending that "this action is entirely collateral to Plaintiff's appeal to the MAC." (Pl. Br. at 12). "A claim is collateral where it challenges administrative processes or regulations, rather than reimbursement decisions, and where it does not seek the same relief sought in the underlying administrative hearing." *Integrity Soc. Work Servs., LCSW, LLC. v. Azar*, No. 20-CV-02770, 2021 WL 4502620, at *10 (E.D.N.Y. Oct. 1, 2021), *aff'd sub nom. Integrity Soc. Work Servs., LCSW, LLC v. Becerra*, No. 21-2757, 2022 WL 1930866 (2d Cir. June 6, 2022). "Exhaustion is the rule, waiver the exception." *Abbey*, 978 F.2d at 44. As discussed above, the thrust of Plaintiff's First through Fifth Claims for Relief are claims for benefit payments to cover the cost of her stay at HHH when her coverage ceased and for further Medicare benefits in the form of further intensive therapy, and that Defendants erred by not providing that level of care and not specifying it in a written discharge plan. Whether Plaintiff needed and would benefit from further IRF care, and whether any deficiency in the CMS-10066

notice impacted discharge to a SNF were questions raised and decided against her in her Medicare appeals and as such, these claims are not collateral. (*See* Doc. 184-29; Doc. 184-33).[7]

To the extent Plaintiff attempts to argue that the availability of a jury trial on these claims in federal court is what renders the exhaustion requirement waived—and it is not at all clear to the Court that she does so argue this point (*see* Pl. Br. at 12-13)—the Second Circuit has explained that there exists no "right *not* to pursue the administrative process." *Abbey*, 978 F.2d at 46 (emphasis added). Accordingly, further administrative review of Plaintiff's claims would not be futile and thus waiver of the exhaustion requirement is inappropriate in this case.

Simply put, Plaintiff was required to, but has not, exhausted administrative remedies and has not established that judicial waiver of the requirement would be appropriate in this case. Accordingly, the Court concludes that it lacks subject matter jurisdiction over Plaintiff's First through Fifth Claims for Relief on the grounds that the claims arise under the Medicare Act and Plaintiff failed to exhaust administrative remedies.[8] Summary judgment in favor of Defendants dismissing these claims is therefore warranted.

---

[7] Plaintiff, arguing that this action "is entirely collateral to the Medicare process" points to the footnotes in the ALJ's decision that indicate certain arguments raised by Plaintiff in her Medicare appeals were outside the ALJ's jurisdiction and that Plaintiff was free to pursue whatever avenues of redress they felt appropriate. (Pl. Reply at 6-7 (citing Doc. 184-33)). As discussed herein, the issues raised in Plaintiff's First through Fifth Claims for Relief were raised, considered, and decided in her Medicare appeals, were not the subject of those footnotes, and are therefore not collateral.

[8] As discussed herein, an action may be commenced in federal court to review a Medicare determination such as this only after a claimant has obtained a final agency decision, such as denial of relief by the MAC, "which may be appealed to the district court (if the aggregate amount in controversy is $1000 or more)." *Pavano v. Shalala*, 95 F.3d 147, 150 (2d Cir. 1996). Such judicial review is further circumscribed by the relevant statutory scheme which limits the district court "to base its judgment 'upon the pleadings and transcript of the record.'" *Est. of Landers v. Leavitt*, 545 F.3d 98, 113 (2d Cir. 2008), *as revised* (Jan. 15, 2009) (citing 42 U.S.C. § 405(g) and *Mathews v. Weber*, 423 U.S. 261, 263 (1976) (noting that, under § 405(g), "[t]he court may consider only the pleadings and administrative record, and must accept the Secretary's findings of fact so long as they are supported by substantial evidence")). Even if Plaintiff had exhausted her administrative remedies, Plaintiff's attempt to couch these claims as § 1983 claims based upon liberty and property interests protected by the Fourteenth Amendment falls flat, as Plaintiff has cited no authority to actually support her theories other than cases involving unrelated fact patterns.

B.  The Sixth Claim for Relief

The Sixth Claim for Relief alleges that Martucci violated Plaintiff's right to privacy by disclosing her medical information in a guardianship petition, thereby violating Plaintiff's substantive due process rights. "The Supreme Court has long recognized a right to privacy protected by the Due Process Clause of the Fourteenth Amendment." *Rutherford v. Katonah-Lewisboro Sch. Dist.*, 670 F. Supp. 2d 230, 239 (S.D.N.Y. 2009) (citing *Whalen v. Roe*, 429 U.S. 589, 598–600 (1977)). "To establish a violation of the constitutional right to privacy, a plaintiff must first show that she had a privacy interest—that is, a 'reasonable expectation of privacy'—in the information that was disclosed." *Id*. at 239-40 (quoting *Sean R. v. Bd. of Educ.*, 794 F. Supp. 467, 469 (D. Conn. 1992)). "[T]he interest in the privacy of medical information will vary with the condition." *Matson v. Bd. of Educ. of City Sch. Dist. of New York*, 631 F.3d 57, 64 (2d Cir. 2011). "A general medical determination or acknowledgment that a disease is serious does not give rise ipso facto to a constitutionally-protected privacy right." *Id*. at 65.

Upon a plaintiff's showing of a privacy interest in the information disclosed, and where it is alleged that "executive action infringed upon" that protected privacy right, the plaintiff must show that such action "shocks the conscience." *Id*. at 240; *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005) ("Mere irrationality is not enough: 'only the most egregious official conduct,' conduct that 'shocks the conscience,' will subject the government to liability for a substantive due process violation based on executive action." (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998))).

Plaintiff no doubt suffered serious medical conditions, but not of the type that "carry with it the sort of opprobrium that confers upon those who suffer from it a constitutional right of privacy as to that medical condition." *Matson*, 631 F.3d at 67. There is "no evidence in the record revealing

16

societal discrimination and intolerance against those suffering" from the conditions disclosed in Plaintiff's medical records. *See e.g. Matson*, 631 F.3d at 67-68 (declining to extend right to privacy to fibromyalgia); *see also Golub v. Enquirer/Star Group, Inc.*, 681 N.E.2d 1282 (N.Y. 1997) (cancer). Further, the disclosure of limited medical information in the guardianship petition here was not conscious-shocking. The petition revealed very little information—that Plaintiff had a brain injury, subdural hematoma, status epilepticus, and cognitive impairment, that she "required total care with all activities of daily living and skilled nursing care for wound care and medication administration" and listed her medications—did not attach any records, and was filed under seal.[9] (Doc. 184-42). The petition was filed in an effort to effect a safe discharge because the Proxies refused discharge despite two Livanta findings in favor of discharge and Defendants' concern that Plaintiff could acquire antibiotic resistant bacteria by unnecessarily prolonging her stay at HHH. (*See id.*; *see also* Doc. 184-28 at 46:13-25).

Under these circumstances, because Plaintiff's "medical condition does not enjoy a constitutionally-protected right to privacy," *Matson*, 631 F.3d at 69, Defendants are entitled to summary judgment dismissing the Sixth Claim for Relief.

C.   The Seventh through Twelfth Claims for Relief

Plaintiff's Seventh through Twelfth Claims for Relief are state law claims. Because there is no longer any federal claim remaining against Defendants, there is no longer any independent basis for federal jurisdiction over them in this action. Having determined that Plaintiff's First through Sixth Claims for Relief against Defendants should be dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claims alleged against them. *Maco*

---

[9] Plaintiff herself disclosed similar and more detailed information in a publicly-filed Complaint against another hospital and several physicians, which suit she brought under her real name. (56.1 ¶ 15; Doc. 184-19).

*v. Baldwin Union Free Sch. Dist.*, 249 F. Supp. 3d 674, 680 (E.D.N.Y. 2017), *aff'd*, 726 F. App'x 37 (2d Cir. 2018). The traditional values of judicial economy, convenience, fairness, and comity weigh in favor of declining to exercise supplemental jurisdiction where all federal law claims are eliminated before trial. *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006). Accordingly, the Court dismisses Plaintiff's Seventh through Twelfth Claims for Relief against Defendants without prejudice. *Whitehead v. City of New York*, 953 F. Supp. 2d 367, 377 (E.D.N.Y. 2012).

II.   Plaintiff's Motion for Relief From April 19, 2023 Order

The Court held a pre-motion conference on April 19, 2023 to discuss Defendants' anticipated motion for summary judgment. (Doc. 161; Doc. 163; Doc. 181, "4/19/2023 Tr."). At that conference, Defendants' counsel advised that Plaintiff, six days earlier, had served him with a 25-page sanctions letter that read like a brief in opposition to a defense motion for summary judgment that had not yet been briefed or filed. (4/19/2023 Tr. at 18:9-19). After hearing from Plaintiff, "the Court directed Defendants to comply with the time limitations for any response to the motion under Rule 11, but directed that to the extent Plaintiff intends to pursue the motion, she shall proceed by filing a premotion letter requesting a conference (not the motion itself), and that she shall do so only after the motion summary judgment and any potential sur-reply is fully filed and *sub judice*." (Doc. 175; *see also* 4/19/2023 Tr. at 19:24-21:9, 22:22-25).

On May 5, 2023, before the motions for summary judgment were filed, Plaintiff filed a "Motion for Relief from an Order Preventing Plaintiff from Filing a Rule 11 Motion for Sanctions." (Doc. 176). Defendants opposed on May 19, 2023 (Doc. 179), and Plaintiff filed a reply memorandum of law on May 26, 2023 (Doc. 182). The thrust of Plaintiff's motion is that the Court's April 19, 2023 Order impermissibly prevented her from filing a sanctions motion

addressed to Defendants' pre-motion summary judgment letter. The Court, however, did not make any order preventing Plaintiff from making a sanctions motion; rather, it explicitly extended Plaintiff's time to so move, conditioned upon her first filing a pre-motion letter, until after the summary judgment briefing was *sub judice* in an effort to preserve judicial resources. (*See* Doc. 175; *see also* 4/19/2023 Tr. at 20:1-3).

This is not the first time a district court has directed a party to wait to file a Rule 11 sanctions motion, nor is it the first time a district court has been presented with the argument that it is improper to establish a schedule for presenting such a motion. Indeed, the Second Circuit in *Lawrence v. Richman Grp. of CT LLC*, when confronted on appeal with such an order of the district court, stated that "[i]n a case such as this, presenting almost relentless motion practice, a court may understandably wish to establish a sensible schedule for presenting issues" and "parties may reasonably be expected to follow a court's scheduling orders." 620 F.3d 153, 159 (2d Cir. 2010). The subject order in that case directed the moving party to wait to file a Rule 11 sanctions motion until it was "clear which claims actually will remain in this lawsuit." *Id*. at 159. The Circuit made clear that while that the safe harbor requirements of Rule 11(c)(2) must not be negated by the district court's scheduling order, a court has authority to set a schedule for formal filing of a sanctions motion. *Id*.

Plaintiff maintains that Defendants' "failure to withdraw or correct the pre-motion letter" required the Court to withdraw or modify its order so as to permit her to immediately move for sanctions. The Court, however, directed Defendants to respond to Plaintiff's letter in accordance with the Rule 11 safe harbor time-frames—that direction did not require Defendants to withdraw their pre-motion letter, nor did it prevent Defendants from making their motion for summary judgment. The sanctions motion that Plaintiff sought to file was based on her position that

Defendants' summary judgment arguments were frivolous. This is precisely the reason the Court instructed Plaintiff to wait to move for sanctions until the summary judgment motions were briefed and filed: if the bases for Plaintiff's sanctions motions are identical to the arguments made in the summary judgment motions, why ask the Court to adjudicate those issues twice? With the benefit of full summary judgment briefing from both sides, a full factual record, and ample case law, the Court is more adequately positioned to evaluate the merits of the arguments that Plaintiff claims, in her sanctions motions, were "frivolous."

Accordingly, Plaintiff's motion for relief from this Court's April 19, 2023 Order is denied.[10]

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment (Doc. 183) is GRANTED and Plaintiff's motion for summary judgment (Doc. 187) is DENIED. The First through Sixth Claims for Relief alleged in Plaintiff's Second Amended Complaint are dismissed with prejudice. Because the Court declines to exercise supplemental jurisdiction over the Seventh through Twelfth Claims for Relief, those claims are dismissed without prejudice.

Plaintiff's motion for relief from the Court's April 19, 2023 Order (Doc. 176) is DENIED.

The Clerk of Court is respectfully requested to terminate the pending motion sequences (Docs. 176, 183, and 187), enter judgment, and close this case.

---

[10] On August 25, 2023, after the summary judgment motions were fully submitted, Plaintiff filed a pre-motion letter in connection with her anticipated sanctions motions. (Doc. 195). On September 12, 2023, the Court waived any pre-motion requirement and permitted plaintiff to file her motions for sanctions but held the time for Defendants to oppose those motions in abeyance pending the Court's review and consideration of the summary judgment motions. (Doc. 202). Thereafter, Plaintiff filed two motions for sanctions. (Doc. 204; Doc. 207). On February 12, 2024, Plaintiff filed a letter-motion seeking "a motion schedule on the Rule 11 Motions; or, in the alternative, schedule a conference to address the issue." (Doc. 223). The Court will address Plaintiff's February 12, 2024 application in a separate order.

SO ORDERED.

Dated:  White Plains, New York
          February 28, 2024

_____
Philip M. Halpern
United States District Judge